ELIZABETH IDEN, APPELLEE, V. EVANS MODEL LAUNDRY, APPELLANT.

FILED MAY 8, 1931. NO. 27484.

*B. N. Robertson,* for appellant.

*Gerald E. La Violette* and *Gray & Brumbaugh, contra.*

Heard before Goss, C. J., Rose, Dean, Good, Eberly, Day and Paine, JJ.

Rose, J.

This is an action to recover $2,000 in damages for slander. Plaintiff was an employee in defendant's laundry in Omaha and with other female employees was thus engaged May 21, 1929. She called at the office of defendant in the laundry building for her wages. The petition contains the plea, in substance, that defendant's manager, addressing plaintiff in the presence of others, and referring to another employee named Josephine Connor as "this girl" and "this little girl," then and there said: "Seems as though this girl has had some difficulty concerning her pay envelope and it seems as though you took it," and "the best thing we can do is to take out of your money what this little girl has lost and give you the difference and dismiss you, because you are a thief;" thus charging plaintiff with larceny and with having stolen the money of Josephine Connor. It is further alleged that these charges were false and damaged plaintiff in her reputation for honesty and uprightness—qualities essential to her employment in laundries, the means by which she supports herself and two children.

Defendant denied that its manager called plaintiff a thief, admitted he stated to her in a conversation relating to the pay envelope of Josephine Connor that "the best thing we can do is to take out of your money what this little girl has lost and give you the difference," or words to that effect, and pleaded that the communication and occasion were privileged, plaintiff and other employees only being present; that reported disappearance of the pay envelope came to the notice of defendant's manager through Josephine Connor, Della Gooddell, and Nora Neubauer, employees in the laundry; that the manager acted in good faith, without malice or intention to cause plaintiff loss or injury, in the honest belief that what he said was essential to the safety and welfare of employees and the

best interests of defendant; that plaintiff became huffy and left the office, saying she would see her attorney; that defendant thereupon paid plaintiff her wages in full, and that she was no longer an employee of defendant.

In a reply to the answer, plaintiff specifically denied that defendant paid her wages in full May 21, 1929, and alleged that the amount due her, including costs, was paid by defendant to the clerk of the municipal court June 13, 1929, in an action therein pending. Other unadmitted allegations of the answer were also denied.

Upon a trial of the issues, the jury returned a verdict in favor of plaintiff for $1,500. From a judgment therefor, defendant appealed.

It is argued on appeal that the evidence is insufficient to sustain the verdict. As pleaded in the petition, the oral expressions addressed by defendant's manager to plaintiff were of themselves slanderous. An examination of the entire record leads to the conclusion that evidence, believed by the jury, as it was, proved the following facts: Defendant's manager called plaintiff a thief at the time and place and under the circumstances alleged by her; that the charge was false and that it was published by defendant; that plaintiff was dismissed from defendant's employ with infamy on her name; that defendant's manager in uttering the slander was prompted by actual or express malice, independently of privilege which was pleaded as a defense; that there was no sufficient inquiry into the facts or legal excuse for the false and defamatory utterance. In addition to the evidence of facts summarized, defendant admitted in its answer what amounts to an implication that plaintiff stole Josephine Conner's pay envelope. The admission is that the manager said: "The best thing we can do is to take out of your money what this little girl has lost and give you the difference"— an admission implying that defendant accused plaintiff of being a thief. Malice is presumed from the false, oral, published charge that plaintiff was a thief. Circumstances tend to show express malice. Express "malice" creating liability for a false, published accusation of crime, notwith-

standing the occasion for a qualified privilege, does not mean hatred or ill will, but want of legal excuse for the false and defamatory utterance. In 1909 the law was announced as follows:

"Malice in law will be presumed from the publication of an article libelous *per se,* and that presumption will become conclusive unless the truth of the libel is established. Such malice does not mean hatred or ill will, but the want of legal excuse for the publication. Damages will also be presumed from the publication of an article libelous *per se."* Sheibley v. Nelson, 84 Neb. 393. See, also, *Estelle v. Daily News Publishing Co.,* 99 Neb. 397; *Peterson v. Cleaver,* 105 Neb. 438; *Hall v. Rice,* 117 Neb. 813.

The evidence, in view of the law applicable thereto, fully sustains the verdict of the jury and the judgment of the district court.

Instructions on the law applicable to privileged communications are criticised as inconsistent and as prejudicial to defendant. Construed as a whole, as they should be, they do not contain prejudicial error. So construed, they fully and fairly stated the law applicable to the issues of fact and the evidence. Any errors in instructions considered separately were not prejudicial to defendant. By the charge as a whole the jury were not permitted to return a verdict in favor of plaintiff without finding actual or express malice on the part of defendant. The recovery does not seem to be excessive. The entire record has been examined without finding a reversible error.

AFFIRMED.

GOSS, C. J., and GOOD, J., dissenting.

We dissent from the majority opinion for the following reasons: We think it clearly appears that, if defendant's officer and manager uttered the words, charged as slanderous by plaintiff, they were uttered under a condition which rendered them absolutely privileged. Some one of defendant's employees had taken the pay envelope of a coemployee. Four employees were interested and under possible suspicion. These persons only were present when the alleged slanderous charge was made. Defendant owed a

duty to these employees to ascertain which ones were innocent and which one guilty. The evidence and circumstances before defendant's manager were sufficient to reasonably warrant him in believing that plaintiff was the guilty person. Acting upon this information, he performed a duty which defendant owed to the other employees—to exonerate them from any suspicion. There is no evidence that would justify an inference or finding that defendant's manager acted with express malice.

We think the fifth paragraph of the court's instructions was prejudicially erroneous. It is in part as follows: "The burden of proof is upon the plaintiff to satisfy you by a preponderance of the evidence of the speaking of the words, *or some of them,* by an officer of the defendant, charged in the petition as slanderous, and if you find from the testimony that such slanderous words, *or some of them,* were spoken by the officer of the defendant, you will next inquire whether or not they were spoken under such circumstances as rendered them privileged." (Italics ours.)

Of the five or six persons who were present, including plaintiff and defendant's manager, only one testified that plaintiff was called a thief, or words of like import. All the others testified that the word "thief," or any word of that import, was not used. Under the instruction given, if the jury found that some of the words, even though they were not slanderous, were used, it would permit them to return a verdict for the plaintiff.

Because the communication was privileged and there was no proof of express malice, and because of the error in the instruction, the judgment should be reversed.

PAINE, J., dissenting.

I find that I am unable to agree with the opinion rendered in this case by a bare majority of this court.

In the opinion rendered will be found a statement of the allegations of the pleadings, but I prefer to state at some length the evidence as found in the bill of exceptions.

Elizabeth Iden, the appellee, who will hereafter be called the plaintiff, had been employed in the laundry under her maiden name of Elizabeth Heisel, and had worked for a few weeks.

The appellant is the Evans Model Laundry, a corporation, of which M. M. Robertson is the president, treasurer, manager, and practically the sole owner, and said laundry corporation will hereafter be called the defendant.

At the close of work on Tuesday night, May 14, 1929, the plaintiff, who was learning to be a shirt finisher, went from her machine on the second floor to the dressing room on the third floor to get her street clothing. Many girls used this small dressing room, which was about 12 by 14 feet. Four persons were present in the room at that time, an Italian girl named Lena, Della Gooddell, the plaintiff, and Josephine Connor. The plaintiff testified that she sat down on a bench just a moment to tie her shoes, then put on her hat and coat, and hurried out to get her pay envelope from Nora Neubauer, the forelady, whose office was on the second floor, to overtake Annis Plaster, another employee. She punched the time clock card and went out to the street, but Annis had already gone, so she waited for Della Gooddell. All employees, including the forelady, are called by their first names only in the evidence.

While she was waiting there, Della came running out, without hat or coat, and said: "Elizabeth, you come right upstairs, right now, and clear yourself. * * * There is a girl upstairs that says she lost her money and the one with the red coat and hat on, she thinks, took it." She took the plaintiff up to Nora, the forelady, and plaintiff asked, "What is the matter, Nora?" Nora answered: "Elizabeth, this little girl standing here, Josephine, lost her pay check and she says you took it. Would you mind letting me look and see?" Plaintiff answered, "Surely." Nora searched one pocket at least, and felt of others to see if she could feel the lost pay envelope, and examined the plaintiff's own envelope in the plaintiff's hand and found it was her own.

Della testified she found Elizabeth on the street corner; that she was standing with her back to her; "and I said, 'Elizabeth, go upstairs.' And she said, 'I don't have to.' But I said, 'Elizabeth, there is a girl that lost her money and she says you took it,' and I says, 'Go and clear your-

self.' · And she said, 'Well, I can go,' * * * and I took her by the arm and led her upstairs." Della testified that on the way up the plaintiff threw down a yellow ten-dollar bill at the stairway entrance, but picked it up again; that after that she held one hand clinched; that when the fore-lady spoke of making a search Della expected the missing money would be found, but it was not; that Della and the plaintiff at once took a street car to Council Bluffs, where they lived; that on the way over the plaintiff tore open her own pay envelope and took out a green ten-dollar bill and $2.85 in silver; that they stopped at a market and that Della saw the plaintiff had two ten-dollar bills and over $5 in silver; that the night before the plaintiff had bor-rowed money of her, but on this particular evening she bought Della a little present, a thing she had never done before; that Della objected, but finally took it, and that Della reported all of these facts to the forelady, Nora, the next morning. Nora testified that the plaintiff was as white as snow when Della brought her in, and that she reported all of these facts to Mr. Robertson during the week while he was making the investigation.

The facts disclosed in the evidence show that Mr. Rob-ertson did not personally know the plaintiff, who had worked at the laundry for less than two months, while Josephine had worked there for two years. Josephine, Della, and Elizabeth, while they are called girls in the evi-dence, are all married women; the plaintiff having two children.

The following Tuesday night, when plaintiff asked the forelady for her pay envelope, Nora told her she would have to go to the first floor to Mr. Robertson's private office, which she did.

The testimony shows that Mr. Robertson had no reason to hold any malice against the appellee, for he did not know her, as she had been employed by Nora; that the facts which were reported to him by Nora, Della and Jo-sephine would fairly justify a belief on his part that the appellee was guilty of taking the money; that the only persons present in his closed private office at the time the

plaintiff went down there were Nora, the forelady, and Della and Josephine, whose money had been taken. Mr. Robertson asked Josephine to tell about it. She said that she had laid her pay envelope on the bench, that she went over to put on her other dress, that Elizabeth was the only person sitting on the bench, and that when she turned around her pay envelope and Elizabeth were gone. The plaintiff testified that Mr. Robertson twisted his thumbs for a moment, reached over to the middle drawer of his desk, pulled out two envelopes, and said: "Well, the only thing I can do about this is to pay you for what you worked, for Monday and Tuesday, deducting the pay I had to repay Josephine Connor, and will have to dismiss you, by your being a thief." And the plaintiff answered: "No, sir; I will not touch a dime of that; I will go see a lawyer tomorrow morning," and walked out. Suit was at once brought in the municipal court for the wages due, and plaintiff received them.

Under the most rigid cross-examination on this point, Nora, the forelady, Della, the old employee, Josephine, who had lost the money, and Mr. Robertson, each and all positively denied that the words testified to by the plaintiff, "your being a thief," were used, either in that language or any other by Mr. Robertson on that occasion. So the use of the word "thief," as set out in the first three syllabi in the opinion, is based, so far as direct evidence is concerned, upon the uncorroborated testimony of the plaintiff alone, and absolutely denied by every other person present in the little office at that time.

Edwin J. Connor testified that on May 14, about 4:30 or 5:00 p. m., he stood across the street from the Evans Laundry, waiting for his wife to come from work, and he saw a girl come out of the laundry, and in response to a question he answered: "I saw her. She had something in her hand, and it looked to me like an envelope, and she took something out of it, whatever it was, I couldn't see, I was too far away, but she took the envelope, tore it up and threw it in the street. Q. Did you see her do anything with anything that came out of it? A. It looked

like she put it in her side pocket or something; she lifted it out and headed to the side of the street and tore the envelope up and threw it in the street. Q. What did she do with the contents? A. It looked like she put it in her pocket. * * * Q. Let's get this—she walked along slow, tore the envelope open, and, after she tore it open, she put it in her pocket, or what seemed to be her pocket, and then started to run after the car, or what you thought was a car? A. Yes. Q. But she didn't get the car? A. No; the girl came out. Q. And she didn't keep on running after the girl called her? A. No; she shook her head like she didn't want to go back. Q. But she did go back? A. Yes. Q. And you saw them go back into the entrance together? A. Yes."

Upon the question of any damages suffered by the plaintiff we find but little evidence. "Q. Mrs. Iden, as the result of the statements of Mr. Robertson in that room, did you suffer any humiliation? A. Yes; I did. * * * Q. Mrs. Iden, as a result of this experience, I want you to describe to the jury, in just what way you experienced a feeling of humiliation. A. Well, I just feel this way—I don't know what to do, I just feel so humiliated; and I knew I had to work and I was afraid to go and give the reference of where I had worked for fear it would come back and cause me to lose my job, and I have two children to support. Q. Go ahead and explain your sense of humiliation. A. And I just feel if they call back there and get that report I won't have no work, and I feel humiliated and terrible, and if I meet any of the girls that worked down there, they will look at me so funny and think she did that— (interrupted). * * * Q. Have you met the three girls that were in the office when Mr. Robertson made the statement that you have given? have you met them since? A. No; I haven't. Q. You haven't met them? A. No. Q. Until in the courtroom today? A. Until today."

In other words, none of the girls present in the office when she was discharged had ever met her from that day until they met in the courtroom at the trial.

On this evidence it is asked that a verdict of $1,500 for such damages be sustained.

1. With this rather lengthy review of the facts in the case, we will discuss the law involved. The manager of the defendant plant was responsible for the successful operation of his laundry. It was his duty to at once examine into every charge made of property being stolen; for, if an employee was found who would steal from another, he could as easily steal small articles sent to the laundry by its customers. The steps taken by Mr. Robertson were slow, deliberate and careful. He got all the information that he could obtain from the three principal actors. He then waited one week, called in the girl who had been accused of taking the pay envelope, and in her presence discussed the matter. Her conduct on this occasion doubtless confirmed him in the decision he had already reached, for he had taken out from her envelope the amount of money that Josephine had lost and tendered the balance to plaintiff and dismissed her from his employ. Do not these facts bring this case clearly within the privileged communication rule?

"A privileged communication is one made upon a proper occasion, from a proper motive, in a proper manner and based upon reasonable or probable cause." *Hartman v. Hyman & Lieberman*, 287 Pa. St. 78, 48 A. L. R. 567.

It is made by one in the discharge of a private duty, as in the conduct of his own affairs, and if made to one who has a corresponding interest to receive such communication, the occasion is privileged. *International & G. N. R. Co. v. Edmundson*, 222 S. W. (Tex.) 181; *Baker v. Clark*, 186 Ky. 816.

A privileged communication is one containing matter which but for the occasion on which it is made would be defamatory and actionable, and may be divided into two classes—the absolutely privileged and the conditionally or qualifiedly privileged. *Grantham v. Wilkes*, 135 Miss. 777.

What is qualified privilege? Newell, Slander and Libel (4th ed.) sec. 389, defines it thus: "In the less important matters, however, the interests and welfare of the public

do not demand that the speaker should be freed from all responsibility, but merely require that he should be protected so far as he is speaking honestly for the common good. In these cases the privilege is said not to be absolute but qualified; and a party defamed may recover damages notwithstanding the privilege if he can prove that the words were not used in good faith, but that the party availed himself of the occasion wilfully and knowingly for the purpose of defaming the plaintiff. In this class of cases it will be convenient to divide the occasions into four classes: (1) Where the circumstances of the occasion cast upon the defendant the duty of making a communication to a certain other person to whom he makes such communication in the *bona fide* performance of such duty. (2) Statements made for protection of private interests. (3) Where the defendant has an interest in the subject-matter of the communication and the person to whom he communicates it has a corresponding interest. (4) Reports of the proceedings of courts of justice and legislative bodies."

In *Southern Ice Co. v. Black,* 136 Tenn. 391, a judgment for plaintiff was reversed and the case dismissed when a foreman, in discharging an employee, said: "You are a damned thief." The court there cites many cases, and says: "We think the words spoken by the foreman were qualified privilege. It was not full privilege. By this is not meant that the words are not slanderous *per se,* and therefore actionable; but what is meant is that such a communication is not actionable unless malice is proved. Qualified privilege extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. Newell on Slander and Libel (3d ed.) sec. 493; Odgers (5th ed.) p. 227; Townshend (4th ed.) 299; *Chambers v. Leiser,* 43 Wash. 285, 86 Pac. 627, 10 Ann. Cas. 270. The rule announced is

necessary in order that full and unrestricted communication concerning a matter in which the parties have an interest or a duty may be had. It is grounded upon public policy as well as reason."

In *Peterson v. Cleaver,* 105 Neb. 438, 15 A. L. R. 447, Mrs. Cleaver, as chief executive officer of the Degree of Honor, published an article in the official journal of that society, sent only to its members, charging that the plaintiff was short in her accounts as financier of her lodge, and that, although she had promised to make good her shortage, she had refused to do so. This court held that, although the article was libelous *per se,* yet it was qualifiedly privileged, and that such privilege was a complete defense, unless the plaintiff established by a preponderance of the evidence that the publication was made with express malice.

In the opinion of the majority of this court is found cited, as supporting a recovery in this case, *Hall v. Rice,* 117 Neb. 813, in which Judith Hall, a clerk, charged that she was called to the office in a drug store of the Liggett company in Omaha, and accused of stealing money, and intimidated into signing a confession to that effect, in consequence of which she claimed she had been blacklisted and unable to obtain work, yet, in an opinion which reviews many cases, the judgment for plaintiff was reversed on the ground that the communication was one of qualified privilege and the jury should have been instructed upon that theory.

In a well-written article upon qualified privilege in making accusation of employee's dishonesty, based upon this case of *Hall v. Rice, supra,* found in 8 Neb. Law Bulletin, 193, a large number of cases on this question are considered. Among them are: *Denver Public Warehouse Co. v. Holloway,* 34 Colo. 432, 114 Am. St. Rep. 171, 3 L. R. A. n. s. 696; *Bolton v. Walker,* 197 Mich. 699; *Peterson v. Cleaver, supra.*

Near the close of this article in the Nebraska Law Bulletin, I find this language referring to the case of *Hall v. Rice, supra:* "It is evident from a comparison of the fore-

going cases with the case in hand that the court's failure to refer to the defense of qualified privilege in its instructions was error. In an action for slander, if the court finds quasi or qualified privilege, questions of slander or no slander, malice or no malice, are usually for the jury, but the court must instruct as to the nature and effect of qualified privilege and its bearing on the jury's consideration of facts in issue."

2. Many cases are found reviewed in an article in 13 Virginia Law Review, 241, which concludes: "Virginia, holding with the weight of authority, does not require reasonable grounds for belief in the truth of the statements made under a qualified privilege, provided actual belief on the part of defendant existed."

Gatley, Libel and Slander, 627, adds: " 'But honest belief must be founded on some sort of reasonable basis,' and therefore, in determining whether such honest belief did in fact exist, the jury are entitled to take into consideration the character of the grounds on which it is founded."

In my opinion, if we should admit that the president of the defendant company spoke the words complained of, with honesty of purpose, to a person who had a legitimate interest in their subject-matter, or some duty in connection therewith, the mere fact that one or even several persons happened to be present and heard what was said will not necessarily destroy the privilege which the law would otherwise afford. It is often impossible, in the conduct of a large business, to handle all such matters in strict privacy. See, also, *Pokrok Zapadu Publishing Co. v. Zizkovsky*, 42 Neb. 64; *Sunderlin v. Bradstreet*, 46 N. Y. 188; *Bigley v. National Fidelity & Casualty Co.*, 94 Neb. 813.

"The fact that the words in question are strong is no evidence of malice, if on defendant's view of the facts strong words were justified; or that the statement was volunteered is no evidence of malice, if it was defendant's duty to volunteer it. The fact that the statement is admitted or proved to be untrue is no evidence that it was made maliciously; though proof that defendant knew it

was untrue when he made it would be evidence of malice." Newell, Slander and Libel (4th ed.) sec. 282.

Malice in common acceptation means ill will against a person, but in its legal sense it means a wrongful act, done intentionally, without just cause or excuse.

"The state of mind, then, of a person who publishes a libel or slander is wholly immaterial in determining his liability except where the occasion is privileged, in which case the plaintiff has to prove malice in the popular and ordinary sense of the term." Gatley, Libel and Slander, 6. See 18 R. C. L. 1.

"The legal presumption of malice * * * is not rebutted by proof that defendant had reason to and did believe the charge to be true; but evidence of knowledge by defendant of facts sufficient reasonably to induce a fair-minded man to believe that plaintiff was guilty of the charge is sufficient to disprove express malice." 37 C. J. 84. See *Donahoe v. Star Publishing Co.*, 20 Del. 166.

As a practical question, jurymen never deal with express malice. There is rarely any direct evidence of express malice given them. Malice is an intent of the mind and heart of a man, and he is the only possible direct witness to that. Express malice is hate, spite or ill will. Blackstone defined it for us in 4 Bl. Com. 199, as: "Express malice is when one, with a sedate, deliberate mind and formed design, doth kill another, which formed design is evidenced by external circumstances discovering that inward intention; as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm."

If the term "express malice" is to be used, it should be defined; but many courts hold that the old distinctions are done away with and that the word "express" is not needed. 18 R. C. L. 5; *United States v. King*, 34 Fed. 302; *Wrege v. Jones*, 13 N. Dak. 267, 112 Am. St. Rep. 679. In *Raley v. State*, 47 Tex. Civ. App. 426, it says that, if the court does undertake to define a word, it should be defined correctly as applying to the case on trial.

If a statement made is libelous *per se* and is untrue in fact, the burden is upon the party who makes it to prove, not only that he in good faith believed the truth of the statement, but that he had evidence sufficient to justify a reasonable man in belief in its truth. But generally a defendant is not liable for publishing a communication of qualified privilege unless there is actual malice on his part.

Let us now examine some of the instructions given by the trial judge. No. 5 reads as follows: "The burden of proof is upon the plaintiff to satisfy you by a preponderance of the evidence of the speaking of the words, or some of them, by an officer of the defendant, charged in the petition as slanderous, and if you find from the testimony that such slanderous words, or some of them, were spoken by the officer of the defendant, you will next inquire whether or not they were spoken under such circumstances as rendered them privileged, within the designation given by the law to privileged communications."

No. 6 reads: "You are instructed that the communication between the plaintiff and the defendant's officer, M. M. Robertson, on the 21st day of May, 1929, in his private office, was what the law terms privileged. Before the plaintiff can recover in this action, the burden of proof is upon her to prove, by a preponderance of the evidence, * * * that Robertson in such conversation did charge the plaintiff with being a thief, and that the charge was false."

In No. 5 the jury were told to ascertain whether the words spoken were privileged, while in No. 6 they were positively instructed that the communication was what the law terms privileged. The court should have clearly defined the term "qualified privilege" for the jury under the evidence in this case.

In the last part of instruction No. 10, the jury were instructed as follows: "And if you believe from a preponderance of all the evidence and circumstances in evidence in this case that M. M. Robertson did speak such words to the plaintiff at such time maliciously and with a desire and intent to injure the plaintiff, then and in that case your verdict should be in favor of the plaintiff, pro-

vided you shall further find from a preponderance of the evidence that such words were untrue, and that M. M. Robertson had not reasonable and probable cause to believe them to be true."

This court has held that, where there are two conflicting instructions, which are confusing to the jury and leave them in doubt and uncertainty as to which is correct, this will be held prejudically erroneous. *Town of Denver v. Myers,* 63 Neb. 107; *Faulkner v. Gilbert,* 62 Neb. 126; *Parkins v. Missouri P. R. Co.,* 72 Neb. 831.

In my opinion the evidence in this case and the rules of law quoted herein from the leading text writers, and supported by abundant authorities, from Nebraska as well as other states, would sustain the following statements as determinative of the points of law involved, and require a reversal of this case:

(1) Qualified privilege extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces not only cases where the duty is a legal one, but also where it is of a moral or social character.

(2) The rule of qualified privilege in the law of slander relates usually to private interests. The time, place and circumstances attending upon the use of the alleged slanderous words are important considerations. If the occasion casts upon the defendant a duty or right to communicate to another some matter of special concern to one or both, or even to others for the protection of other employees or interests which he represents, then the court should instruct the jury clearly as to the nature and effect of qualified privilege.

(3) The fact that the words in question are strong is no evidence of malice, if on defendant's view of the facts strong words were justified; or that the statement was volunteered is no evidence of malice, if it was defendant's

duty to volunteer it. The fact that the statement is admitted or proved to be untrue is no evidence that it was made maliciously; though proof that defendant knew it was untrue when he made it would be evidence of malice.

(4) The state of mind, then, of a person who publishes a libel or slander is wholly immaterial in determining his liability except where the occasion is privileged, in which case the plaintiff has to prove malice in the popular and ordinary sense of the term.

(5) If a statement made is libelous *per se* and is untrue in fact, the burden is upon the party who makes it to prove, not only that he in good faith believed the truth of the statement, but that he had evidence sufficient to justify a reasonable man in belief in its truth. But generally a defendant is not liable for publishing a communication of qualified privilege unless there is actual malice on his part.

(6) The trial court should not give an instruction which, as applied to the facts of the particular case, is misleading or well calculated to mislead, or which, when considered with other instructions, will tend to confuse the jury in the consideration of the issues of the case, or where it will tend to lead them to a wrong conclusion of the facts.