RICHARD K. TURNER, APPELLANT, V. DENNIS E. WELLIVER AND NEBRASKA ALL RISK CROP COMPANY, A CORPORATION, APPELLEES.

411 N.W.2d 298

Filed August 21, 1987. No. 85-328.

William H. Sherwood and Charles J. Cuypers of Sherwood & Cuypers, for appellant.

Jeffrey H. Jacobsen of Jacobsen, Orr & Nelson, P.C., for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

The plaintiff has appealed from the judgment of the district court, which sustained the defendants' motion for a directed verdict made at the close of all of the evidence. This was a trial for damages because of alleged libel and slander. Errors assigned may be stated as follows: (1) The court erred by making findings of fact, which was properly for the jury to do; (2) errors were committed by the court in its interpretation of the rules relating to the law of slander and libel; and (3) rulings of the court as to the admission or rejection of evidence were not supported by either the facts or the law.

Richard K. Turner, the plaintiff, purchased the General Service Agency, Inc., in Holdrege, Nebraska, in 1978. Prior to 1980, "all risk" crop insurance was available to farmers only through an agency of the federal government known as the Federal Crop Insurance Corporation (FCIC). In 1980, the Congress enacted a law which established a new marketing plan for all risk crop insurance whereby that insurance would be made available through master marketers, but it would still be underwritten by the federal government. Turner engaged in the sale of all risk crop insurance as an employee of the FCIC's McCook, Nebraska, office until about February of 1982, when apparently that agency discontinued direct writing.

In 1981, Turner employed Claude Evans as an agent, and later, in the fall of 1981, he and Evans formed a partnership, called T & E, which was designed solely to solicit and sell all risk crop insurance coverage. It was through Evans that Turner eventually met Dennis E. Welliver, in August of 1981. Welliver was lining up agents for Welliver's master marketing company, the Nebraska All Risk Crop Company, also known as NARCC. Turner did contract with NARCC in October of 1981 and placed his all risk crop insurance through that company.

· According to Turner, when the McCook office of FCIC was closed in the early part of 1982 because the agency went to the master marketing plan rather than direct writing, he was given a list of policyholders by a Ross Smith, the then director of the

FCIC in McCook. It seems to be on this basis that Turner claims the insurance customers, whom we will later discuss, were his customers. However, according to the testimony of Welliver, the customers were Welliver's.

There seemed to be no dispute but that, at the time in question, in order for a person to sell federal all risk crop insurance that person had to be certified, after having taken certain tests prescribed by the federal government. Also, it is agreed that Evans was a certified agent while Turner was not. However, Turner could sell crop insurance through a reinsurance program, as distinguished from direct FCIC insurance through a master marketer. It was this latter program that Turner was following until the spring of 1983.

Turner testified that he decided sometime in 1983 to transfer his crop insurance from NARCC to some other company. However, in later, more specific testimony, he said that it was not until the first or second week of April of 1983 when he made a decision to transfer his crop insurance to Rain & Hail Insurance Service, which was a reinsurance program backed by Aetna Insurance Company. At about this same time, according to the testimony of Claude Evans, on April 28, 1983, Evans terminated his partnership of T & E with Turner. Although Turner testified at trial that the T & E partnership still existed, he had earlier, apparently at a deposition, testified that it terminated on April 30, 1983. Exhibit 17 was a statement given by Evans to Turner, which stated that Evans gave Turner his half of the partnership, T & E, provided all commissions then due Evans would be paid to him. Turner conceded that if the partnership were terminated it would have been necessary for him to have hired a certified agent in order to continue handling federal crop insurance through FCIC.

The occasion which precipitated the series of events resulting in the filing of this lawsuit was the mailing of a letter, exhibit 5, to the all risk crop insurance customers which Turner had placed with NARCC during the past year. The text of this letter is set out in full as follows:

April 21, 1983

Dear Insured:

It has been a privilege to handle your "All-Risk" Crop

Insurance business this past year. We hope we have served you well.

In the past our agency contracted your all-risk coverage through the Federal Crop Insurance Corporation's (FCIC) master marketing system. While the coverage was there, we encountered problems in servicing some of our customers, mainly because of delays in losses being processed, indemnity checks being delayed, and other "red tape" hassles.

In an effort to eliminate these problems, we have decided to contract our All-Risk Crop Insurance with Rain & Hail Insurance Service in Omaha. This company has been in business since 1920, and is financially sound, being backed 100% by Aetna Insurance Company for over 60 years, who in turn is backed by FCIC. Our agency has had Crop Hail business with this company for over ten years, and can vouch for their excellent service.

The rates and coverages provided will be identical to those you received with FCIC. We know we will cut out much red tape, and have more control in the adjustment of claims and when they are paid.

To transfer your account to Rain and Hail, we will need to send a transfer request and application to insure that your past FCIC experience will continue on with your new contract. Unless we hear from you to the contrary by April 28, 1983, we will assume you approve this transfer of your account, and will process the necessary forms.

If you have questions, or would like to discuss this personally, please feel free to call or stop in at our office.

Cordially,

GENERAL SERVICE AGENCY, INC.
RKT/CE/fl      R. K. Turner            Claude Evans

The mailing of exhibit 5 apparently prompted Welliver to send out to these same customers exhibit 1, a letter dated April 28, 1983. Two additional sheets were attached to that letter; one was a list of agents and agencies in the Holdrege area who were certified NARCC agents and the other a copy of a form 758 which, if the customer signed, would effect a cancellation of

any crop insurance issued to Turner's agency and a placement of this same insurance with Nebraska All Risk Crop Company. The letter included in exhibit 1 is set out in pertinent part as follows:

April 28, 1983

Dear Insured:

You just have received a letter from the General Service Agency, agents R.K. Turner and Claude Evans, requesting you to transfer your Federal All Risk Crop Insurance to Aetna Insurance Company. Please disregard and ignore.

To transfer your Federal "All Risk" Contract to any other company requires a signed request by you, not your signature written in by Mr. Turner. Mr. Turner has been instructed by the Federal Crop Insurance Corporation (FCIC) that they are returning all previous transfer requests submitted by Mr. Turner and are requiring your personal signature on each request. These requests have to be signed by you by April 30, 1983, to be effective for the 1983 crop year. Any backdating will be monitored very closely by FCIC.

This illegal letter is just a continuation of Mr. Turner's unethical insurance practices. Mr. Turner was investigated by the USDA's Office of Investigation a year ago for similar unethical insurance practices and now this illegal letter will probably prompt another investigation. We have been instructed by Mr. Evans that because of Mr. Turner's continued unethical practices, he is in the process of terminating his partnership with Mr. Turner and will be leaving the General Service Agency. We have reconfirmed Mr. Evan's [sic] intentions today.

In addition, if you do wish your contract to remain directly with FCIC you will not be allowed to leave your file with the General Service Agency. FCIC required all agents who write directly with Federal Crop Insurance to pass a certification test to handle Federal All Risk Crop Insurance for the 1983 crop year. Mr. Turner did not take the time and effort to even attend any of the eight FCIC offered certification training and testing sites across the state, thus enabling him to learn the new changes and

better serve your "All Risk" policy. The deadline for an agent to be certified is April 30, 1983.

Due to all of the above facts we are recommending you transfer to a qualified and FCIC certified agent in your area. If you wish to remain directly with FCIC you will have to transfer.

. . . .

If there are any questions, please call our toll free number 1-800-652-1937.

Sincerely,

/s/ Dennis E. Welliver

Dennis E. Welliver, President

In addition to exhibit 1, Welliver had written exhibit 2, a previous draft of exhibit 1, which contained the phrase "all previous ~~forged~~ transfer requests" instead of the language "all previous transfer requests." Exhibit 2 was not received in evidence because it was not mailed out to anyone. However, Lana Dake, an employee of Sostad & Associates insurance agency, one of NARCC's certified agencies, testified that at a meeting with Welliver which she and several agents of the Sostad agency attended, she saw a copy of exhibit 2.

In answer to a question as to whether anyone had ever told her that Turner had committed forgery in connection with his insurance business, Dake answered that "[f]orgery is a hard word but I'd say 'Yes.' " The person who had told her that was Welliver. There is no indication in the record that she ever repeated this to anyone else.

During the course of the trial it was stipulated between the parties that Turner had sent a letter to Welliver requesting a retraction of exhibit 1 and that no retraction was made. Welliver admitted that no retraction was made because, in his own testimony, he said, "It's all true." Welliver also testified that his purpose in sending out exhibit 1 was to let his customers know what was going on and to properly service these customers, and it was not done in order to get Turner out of the picture or to harm Turner.

It was on the basis of the foregoing set of circumstances that Turner filed this action for libel and slander. The case was tried on a petition filed on November 7, 1984. It was on the basis of

that pleading that the trial court made its rather explicit findings, which we believe will make it easier to follow the progress of this litigation, and we will set them out in some detail later on.

Perhaps it will flow more smoothly for us to deal with the assigned errors in reverse order.

## RULINGS ON EVIDENCE

Turner complains that the court was prejudiced against him because, of the 313 objections made by defendants, 227, or 72 percent, were sustained; whereas, of the 18 objections made by Turner, only 6, or 33 percent, were sustained. We have examined each and every one of those objections, and it would serve no useful purpose to deal with each separately. Suffice it to say that although many of defendants' objections were of a technical nature, we find either no error or no prejudice. The great bulk of the objections were based on leading questions, hearsay, relevancy, opinion evidence, and the document's speaking for itself. The objected-to questions were often repeated three or four times in a slightly changed mode, which accounted for the staggering numbers.

Some of the other evidentiary questions we will treat separately. The first of those is that the court erred in refusing to receive into evidence an enlargement (24 by 36 inches) of exhibit 1, the letter written by Welliver to the various insureds. The actual letter as written was received into evidence. Generally, the reception or rejection of evidence is within the broad discretion of the trial court, and to obtain reversal on the grounds of exclusion of evidence, a clear abuse of discretion must be shown. *Lincoln East Bancshares v. Rierden*, 225 Neb. 440, 406 N.W.2d 337 (1987). Evidence which, although relevant, is cumulative may be rejected by the trial court in the exercise of its sound discretion. *Nusz v. Wells*, 214 Neb. 1, 332 N.W.2d 204 (1983). There neither was an abuse of discretion present nor was the plaintiff in any way prejudiced by the court's ruling.

The other three specific evidentiary complaints raised by Turner relate to the refusal of the trial court to declare Lana Dake a hostile witness and thereby permit the interrogation of her by means of leading questions; the refusal to permit Leo

Holthaus, an employee of FCIC, to give his opinion as to the legality and ethical nature of Turner's insurance practices; and the refusal to permit the testimony of Bruce Lavalleur, Turner's accountant, to give his opinion as to the projected losses to be suffered by Turner.

We have previously indicated that such rulings generally rest within the sound discretion of the trial court. Neb. Rev. Stat. § 27-611 (Reissue 1985) provides in part as follows: "When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." The problem in this case is that there is nothing in the record to sustain Turner's position taken in his brief that "[h]er [Dake's] answers were consistently evasive, her attitude was hostile and her interests were clearly aligned with those of the defendants." Brief for Appellant at 43.

The witness was identified as having been, at the time, an employee of Sostad & Associates insurance agency, as having happened into a meeting involving Sostad, Welliver, and some other employees of Sostad, and as having been shown a document which at least was similar to exhibit 2. Because of the broad discretion allowed to a trial judge in permitting or refusing a request to ask leading questions, we cannot say on the basis of the record before us that he abused that discretion. *State v. Brown*, 220 Neb. 849, 374 N.W.2d 28 (1985).

Leo Holthaus, field operation director for the FCIC, was asked whether he had an opinion as to the legality of exhibit 5, the letter from Turner, and whether, from his investigation of the subject transaction between Turner and Welliver, he found that anyone had been guilty of unethical conduct. Objections were sustained on the bases of relevancy and foundation. No offer of proof was made by Turner as to what the answers might be. Error may not be predicated upon a ruling of a trial court excluding testimony of a witness unless the substance of the evidence to be offered by the testimony was made known to the trial judge by offer or was apparent from the context within which the questions were asked. Neb. Rev. Stat. § 27-103(1)(b) (Reissue 1985). Without regard to the basis for the trial court's ruling, appellant may not predicate error on those rulings.

Finally, regarding evidentiary matters, Turner contends that

the court erred in refusing to allow his accountant, Bruce Lavalleur, to testify as to a projection of loss of income beyond 1984, which he believed Turner would suffer because of the loss of his commissions from federal crop insurance. An offer of proof was made to the effect that exhibit 18 constituted a projection of income which Turner would have had but for the loss of customers for whom he had previously written federal crop insurance. This document was based upon actual income of Turner in 1982 and projected through 1987 by inclusion of a 15-percent increase in client base, and relying not, according to the offer, on the continuation of T & E partnership, but only upon the receipt of $12,719 in commissions received by Turner in 1982.

Although accepting the offer of proof, the trial court sustained the objection to the evidence based primarily, it would seem, on the fact that the witness could not or did not disclose the basis of his assumption of a 15-percent increase in client base. If the assumption for an opinion advanced by an expert witness is not true, such opinion lacks probative value and should be rejected as irrelevant. *Sorensen v. Lower Niobrara Nat. Resources Dist.*, 221 Neb. 180, 376 N.W.2d 539 (1985).

Additionally, although the offer of proof recited that the opinion expressed was not based on a continuation of T & E partnership, the witness had testified earlier that he did, in making his projection, assume that T & E would continue, and immediately after the offer of proof on further examination, the witness said, "I have assumed that T & E Partnership would continue or that it would end amiably with some sort of agreement with Dick Turner and Claude Evans." No reasonable controversy appears in the record over the fact that Turner was not certified to sell federal all risk crop insurance as he had been doing, while Evans was, and that the partnership was terminated as of April 30, 1983.

It is also quite apparent from the testimony of Lavalleur that the $12,719 1982 income, upon which he proposed to base his projection, was income which Turner earned from federal crop insurance through T & E partnership. The proposed opinion, therefore, having no sound and reasonable basis in fact, was properly rejected. *Clearwater Corp. v. City of Lincoln*, 202

Neb. 796, 277 N.W.2d 236 (1979).

Turner's claimed errors regarding evidentiary matters are without merit. Accordingly, regardless of whether the proof made out a case in favor of the plaintiff for libel and slander, there was no competent evidence to support an award of special pecuniary damages. This leaves us to consider whether the case should have been submitted to the jury on the issue of general damages. To answer this question we need next to address Turner's complaint of error regarding the law applied by the trial court.

Neb. Rev. Stat. § 20-204 (Reissue 1983) provides as follows:

Any person, firm, or corporation which gives publicity to a matter concerning a natural person that places that person before the public in a false light is subject to liability for invasion of privacy, if:

(1) The false light in which the other was placed would be highly offensive to a reasonable person; and

(2) The actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Neb. Rev. Stat. § 25-839 (Reissue 1985) provides as follows:

In an action for a libel or slander it shall be sufficient to state, generally, that the defamatory matter was published or spoken of the plaintiff, and if the allegation be denied, the plaintiff must prove on the trial the facts, showing that the defamatory matter was published or spoken of him.

Neb. Rev. Stat. § 25-840 (Reissue 1985) provides:

In the actions mentioned in section 25-839, the defendant may allege the truth of the matter charged as defamatory, prove the same and any mitigating circumstances to reduce the amount of damages, or prove either. The truth in itself and alone shall be a complete defense unless it shall be proved by the plaintiff that the publication was made with actual malice. Actual malice shall not be inferred or presumed from publication.

Finally, Neb. Rev. Stat. § 25-840.01 (Reissue 1985) provides in pertinent part as follows:

(1) In an action for damages for the publication of a libel or for invasion of privacy as provided by section

20-204 by any medium, the plaintiff shall recover no more than special damages, unless correction was requested, as herein provided, and was not published. . . .

(2) This section shall not apply if it is alleged and proved that the publication was prompted by actual malice, and actual malice shall not be inferred or presumed from the publication.

Perhaps the most sensible manner in which to address the remaining assignments of error is to set forth each allegation in the plaintiff's petition, followed by the trial court's ruling and discussion by this court.

## LIBEL

The plaintiff alleges at paragraph 4 that the defendants made the following false accusations:

(1) *The plaintiff practiced forgery in connection with FCIC transfer documents.*

The trial court found that the letter, exhibit 1, does not accuse or imply that plaintiff practiced forgery.

We agree. The letter refers to "all previous transfer requests," not "all previous ~~forged~~ transfer requests" as stated in uncirculated exhibit 2.

(2) *The plaintiff executed FCIC documents without client authority.*

The findings of the court recite that exhibit 1 does not accuse or imply that plaintiff executed documents without client authority.

What the letter did state was that a transfer of a "Federal 'All Risk' Contract" required a signed request by the client, not a signature written in by Turner. This view is undisputed in the record.

(3) *The plaintiff engaged in unethical insurance practices.*

Although the trial court found that exhibit 1 did in fact accuse the plaintiff of unethical conduct, which statements were actionable per se and would subject the defendants to liability without proof of special damages, it concluded as a matter of law that the statements were true and were privileged. It then held that there was no liability on the defendants because the defendants did not act in reckless disregard of the truth or falsity of the statement, and, furthermore, the plaintiff alleged

actual malice in his petition and was therefore held to that standard of proof rather than negligence in failing to ascertain the truth of the statement. The trial court referred to Restatement (Second) of Torts § 580B (1977).

The statements made by the defendants were that the plaintiff was the subject of a USDA investigation in the past and probably would be subject to an additional investigation in the future, that he was uncertified to sell FCIC insurance, and that he failed to attend training sessions. These statements are not contradicted by the record. In addition, the plaintiff's own testimony supports the truth of his unethical conduct. He agreed that backdating of his partnership agreement with Evans was illegal; he acknowledged that he should have known that the signing of the 758 forms with the farmers' names, with his initial, was not a permitted practice; and he conceded that his contact with a Kevin Pesek was "shady."

We find that the overwhelming weight of the evidence supports a conclusion that the statements made by Welliver in exhibit 1 were true. Although for purposes of a motion for a directed verdict a court must assume the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, nevertheless, where there is no credible evidence upon which a jury can properly proceed to find a verdict for that party, the trial court should direct a verdict. *Settell's, Inc. v. Pitney Bowes, Inc.*, 209 Neb. 26, 305 N.W.2d 896 (1981); *Novotny v. McClintick*, 206 Neb. 99, 291 N.W.2d 252 (1980).

In addition, we find that the communication carried with it a qualified privilege. A communication is privileged if made bona fide by one who has an interest in the subject matter to one who also has an interest in it or stands in such relation that it is a reasonable duty, or is proper, for the writer to give the information. *Kloch v. Ratcliffe*, 221 Neb. 241, 375 N.W.2d 916 (1985); *Dangberg v. Sears, Roebuck & Co.*, 198 Neb. 234, 252 N.W.2d 168 (1977); *Hall v. Rice*, 117 Neb. 813, 223 N.W. 4 (1929) (citing *Wise v. Brotherhood of Locomotive F. and E.*, 252 F. 961 (8th Cir. 1918)). Where a qualified privilege exists, there can be no recovery without proof of malice. *Kloch v. Ratcliffe, supra; Bartels v. Retail Credit Co.*, 185 Neb. 304, 175

N.W.2d 292 (1970).

Conditional or qualified privilege comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty. 53 C.J.S. *Libel and Slander* § 89 (1948). The Restatement (Second) of Torts discusses several factors that determine the existence of a conditional privilege arising from an occasion, some of which could be involved in this case.

The conditional privilege involved in this case depends on the relationship among Turner, Welliver, and the recipients of exhibit 1. It appears that Turner was a subagent of Welliver, so the farmers who bought crop insurance from Turner were actually insureds of Welliver's agency. The communications between an insurer and insured may fall within the conditional privileges set out in the Restatement (Second) of Torts § 595 (1977). The Restatement, *supra*, states that a communication may be conditionally privileged if it is made for the protection of the recipient or a third person and the recipient is one to whom the publisher owes a legal duty to publish the matter or to whom the publication is within generally accepted standards of decent conduct. The Restatement, *supra*, § 596, states that a communication between those sharing a common interest is conditionally privileged. Cases involving a conditional privilege between an insurer and an insured are annotated at Annot., 85 A.L.R.3d 1161 (1978).

In several cases discussed in the annotation, courts have held that communications between an insurer and insured about an agent of the insured were qualifiedly privileged. This would be a similar situation as that in the present case, assuming Welliver as the insurer, Turner as his subagent, and the farmers as the insureds.

In *Hahn v. Kotten*, 43 Ohio St. 2d 237, 331 N.E.2d 713 (1975), the plaintiff, a district manager of Woodmen Accident and Life Company, was terminated. He sued the insurance

agency manager and two district managers for slander. The trial court directed a verdict for the defendants, and this was upheld by the Ohio Supreme Court. The defendant agents were instructed to tell insureds who had been served by the plaintiff agent that the agent had been terminated for cause, and if pressed for information, they were to show the insured a copy of the agent's contract describing circumstances under which an agent could be terminated for cause. Following these instructions, the defendant agents communicated with certain insureds of the plaintiff, and these communications were the basis of the slander suit.

The court held that the plaintiff's questionable conduct, including diverting company funds to his own use, placed a duty on the defendant agents to communicate with the insureds and that such communications were qualifiedly privileged. The court stated that a qualified privilege applies where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it. Since the insureds were all doing business with the plaintiff at the time of his termination and subsequently transferred their insurance to the agent's new company, the insurer had a common interest with each insured, and the communication was reasonably calculated to protect or further that interest. In addition, the defendant agents had a legal and moral duty to speak. The court stated that the trial court properly found that the statements were qualifiedly privileged and that without some evidence in the record of the defendants' actual malice, the trial court was required to grant the defendants a directed verdict. See, also, *Trice v. Lancaster*, 270 S.W.2d 519 (Mo. App. 1954); *Holmes v. Royal Fraternal Union*, 222 Mo. 556, 121 S.W. 100 (1909); *Miller Ins. Agency v. Home Fire etc. Ins. Co.*, 100 Mont. 551, 51 P.2d 628 (1935); *Peterson v. Cleaver*, 105 Neb. 438, 181 N.W. 187 (1920).

Because the relationship among those involved in the present case is like the insurer-insured relationship in the cases from the annotation, a similar privilege would apply in this case.

Whether a publication was a privileged one is a question to be determined by the court as an issue of law, unless the facts are in dispute, in which case the jury will be instructed as to the proper

rules to apply. Prosser and Keeton on the Law of Torts, *Qualified Privilege* § 115 (5th ed. 1984). We find the record to reflect no reasonable controversy in this regard and that the communication carried with it a conditional privilege.

This does not dispose of this issue, however. Even though a communication is true or is protected by a qualified privilege, there may be liability on the publisher if such communication or statement was made with malice. *Kloch v. Ratcliffe*, 221 Neb. 241, 375 N.W.2d 916 (1985); § 25-840.

This has nothing to do with plaintiff's claimed error that the trial court incorrectly held plaintiff to a standard of malice, even though, because of the requested correction, § 25-840.01 seems to eliminate the "actual malice" requirement. The requirement of proof of malice to overcome a qualified privilege is quite another matter.

In *Whitcomb v. Nebraska State Education Assn.*, 184 Neb. 31, 165 N.W.2d 99 (1969), this court noted that with the 1957 addition of the last two sentences of § 25-840, truth was made a complete defense absent the proof of actual malice. This is consistent with the constitutional provision, Neb. Const. art. I, § 5, that "the truth when published with good motives, and for justifiable ends, shall be a sufficient defense."

The "malice" as used in § 25-840 must have meant common-law actual malice, rather than the constitutional definition contained in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), because that case postdated our statutory definition by some 7 years.

This court apparently has never defined common-law actual malice in a majority opinion. In *Iden v. Evans Model Laundry*, 121 Neb. 184, 236 N.W. 444 (1931), a dissenting opinion defines express malice (another word for actual malice) as hate, spite, or ill will. The common-law actual malice rule seems to focus on the defendant's attitude toward the plaintiff, while the *New York Times* actual malice rule focuses on the defendant's attitude toward the truth. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252 (Minn. 1980). This is consistent with the definition of the term in the dissenting opinion in *Iden*, and we adopt that definition for the purposes of this case.

The only direct evidence on the issue of good faith or absence

of malice was provided by the testimony of Welliver, who said that his purpose in sending out the letter was to let his customers know what was going on and to properly service these customers, and it was not done in order to get Turner out of the picture or to harm Turner. The fact remains that Turner did send out information to customers of his, who were also insureds of Welliver, which was not accurate and which obviously was intended to lure those customers away from Welliver's Nebraska All Risk Crop Company. Welliver's response would not be unexpected. We find no credible evidence to support a finding of malice on the part of Welliver, and the trial court was correct in its ruling in this regard.

(4) *The plaintiff engaged in illegal insurance practices.*

The trial court found that exhibit 1 does not accuse the plaintiff of engaging in illegal insurance practices, but it did characterize the plaintiff's letter (exhibit 5) as being an illegal letter. However, according to the district court's findings, that statement constituted opinion which is not actionable, as provided by *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), and Restatement (Second) of Torts § 566 (1977).

The Restatement, *supra* at 170, provides the following regarding expressions of opinion as defamation: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." The Restatement draws a distinction between two kinds of expression of opinion. The simple expression of opinion, or pure opinion, occurs when the maker of the comment states the facts on which he bases his opinion and then expresses a comment as to the plaintiff's conduct, qualifications, or character. The Restatement, *supra* at comment *b*. The pure type of expression of opinion also may occur without the expression of the alleged facts on which the maker bases his opinion, but both parties to the communication know the facts or assume their existence and the comment is clearly based on those facts. *Id*.

The second kind of expression of opinion, the mixed type, is an opinion in form or content but is apparently based on facts

about the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. The expression of the opinion gives rise to the inference that the defendant knows undisclosed facts that justify the forming of his opinion.

The Restatement, *supra* at comment *c.*, states that the common-law rule that a pure type of an expression of opinion may be the basis of a defamation action appears to have been rendered unconstitutional by *Gertz v. Robert Welch, Inc., supra*. The Court in *Gertz* stated at 339-40:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

As comment *c.* recognizes, the language in *Gertz* about there being no such thing as a false idea was only dicta. In addition, *Gertz* involved a media defendant, while the present case involved a nonmedia defendant. However, comment *c.* states that the logic of the constitutional principle would appear to apply to all expressions of opinion of the first, or pure, type. Courts have interpreted *Gertz* as prohibiting defamation actions based on expressions of pure opinion, even when nonmedia defendants are involved. See *Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596, 552 P.2d 425, 131 Cal. Rptr. 641 (1976) (involving a labor dispute, with the president and vice president of a labor union as the plaintiffs and the employer of union members as the defendant).

In *Henry v. Halliburton*, 690 S.W.2d 775 (Mo. 1985), an insurance agent and a business brought a defamation action against the author of an article in a trade association newsletter. The article was later sent to two prospective customers, and it was on this action that plaintiffs sued. The article used language such as "fraud" and said that certain agents "acted with 'greed' " in order to "fleec[e]" customers. *Id*. at 778. The plaintiffs alleged that the defendant knew the statements were false and defamatory and were made for the purpose of dissuading the customers from buying life insurance from the plaintiffs and to damage their business reputation. The petition

was dismissed for failing to state a cause of action, and the Missouri Supreme Court affirmed, finding that the statements were nonactionable opinion.

In the final analysis, Welliver's characterization of Turner's letter (exhibit 5) as an "illegal" letter only describes a violation of USDA regulations, which the record bears out as true, and was not actually an accusation of criminal conduct. Additionally, even if Welliver's statements did not qualify as nonactionable pure opinion, the truth of the statements still would be a defense to any defamation claim.

(5) *Plaintiff was the subject of USDA investigation for illegal and unethical insurance practices and would be the subject of an additional investigation.*

According to the trial court, exhibit 1 did accuse and imply that the plaintiff was the subject of a USDA investigation for unethical practices and could be the subject of additional investigation and, as such, was defamatory. As in (3), above, the trial court, however, found that such statements were actionable per se and would subject the defendants to liability without proof of special damages unless the statements were true. The trial court found as a matter of law that the evidence disclosed that the statements were true and were privileged.

We believe that our discussion in (3), above, regarding truth and malice, as well as our general discussion as to special damages, adequately disposes of this issue.

(6) *The plaintiff was uncertified to sell FCIC insurance.*

The trial court, as in (3) and (5), above, held that this was an actionable statement, but furnished no basis for recovery by the plaintiff because of the factors of truth and the absence of malice. This too has been disposed of by our discussion above.

(7) *The plaintiff failed to attend certification training sessions in connection with FCIC insurance.*

The truth of this statement is adequately supported in the record beyond any reasonable dispute, and there is no showing of malice.

## SLANDER

The plaintiff alleges at paragraph 8 of his petition that the defendants made the following false accusations:

(1) *The plaintiff was no longer handling all risk crop*

*insurance, and the only way clients would retain coverage was to sign a cancellation and request for transfer of their business to the defendants' companies.*

The trial court found the defendant's allegation to be true. There is no evidence in the record to the contrary which affirmatively shows that Turner was switching to a program which was the same as federal all risk insurance.

(2) *The plaintiff was uncertified to sell crop insurance, including all risk crop insurance.*

Again, the trial court found that there was absolutely no evidence to support this allegation, except as to all risk coverage and that was true. Nowhere does the record suggest that Welliver stated that Turner was not certified to sell any kind of crop insurance.

(3) *The plaintiff is unethical and refused to obtain the necessary certification to sell crop insurance, including all risk crop insurance.*

As previously stated, the allegation regarding certification was true. Furthermore, the plaintiff himself admitted that his backdating of the partnership agreement was illegal, that he should have known that to sign the individual farmers' names to 758 forms was wrong and not allowed, and that his contact with Pesek was shady.

(4) *The plaintiff had previously been investigated by the USDA for unethical practices and would be investigated again.*

The trial court found that there was nothing in the record to support any such oral statements in that regard. Our opinion has previously discussed and disposed of similar allegations under the heading of libel.

(5) *The plaintiff practiced forgery in executing documents on behalf of insurance clients.*

Turner alleged that Welliver slandered him by stating that Turner practiced forgery in executing documents on behalf of insurance clients. Welliver might have used the word "forgery" when talking to Lana Dake, and did use the word when talking to his secretary. The court found that, even assuming the word "forgery" had been used, there was no evidence of harm to plaintiff's reputation, and there was no competent evidence to prove that the plaintiff suffered any special damages, in part

because there was no proof that the statements were repeated to anyone else.

In addition, applying the principles previously stated in regard to libel, we believe that a conditional privilege attached to these statements. A communication is privileged if made bona fide by one who has an interest in the subject matter to one who also has an interest in it or stands in such relation that it is a reasonable duty, or is proper, for the declarer to give the information. *Kloch v. Ratcliffe*, 221 Neb. 241, 375 N.W.2d 916 (1985). A communication between those sharing a common interest is conditionally privileged. Restatement (Second) of Torts § 596 (1977).

Because the record discloses no proof of actual malice to overcome the conditional privilege, there can be no liability on Welliver.

The judgment of the district court was correct and is affirmed.

AFFIRMED.

KRIVOSHA, C.J., not participating.