maximize speed and efficiency of distributions while minimizing expenses.

Thus, the court today correctly declines the appellant's invitation to expand its review under the waiver rule to evidence outside of the divorce decree and the associated property settlement agreement. But a better approach is available, and I commend it to the Legislature.

———————————

Paul D. Potter, appellant, v. Board of Regents of the University of Nebraska et al., appellees.
___ N.W.2d ___

Filed March 21, 2014.    No. S-13-544.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.
2. **Public Officers and Employees: Immunity: Liability.** Qualified immunity protects government officials acting in their individual capacities from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
3. ____: ____: ____. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.
4. **Constitutional Law: Civil Rights: Actions.** A private right of action to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States is created by 42 U.S.C. § 1983 (2006).
5. **Constitutional Law: Due Process: Tort-feasors.** The 14th Amendment's Due Process Clause does not extend to citizens a right to be free of injury wherever the State may be characterized as the tort-feasor.
6. **Due Process.** Procedural due process limits the ability of the government to deprive people of interests that constitute "liberty" or "property" interests within the meaning of the Due Process Clause and requires that parties deprived of such interests be provided adequate notice and an opportunity to be heard.
7. **Due Process: Termination of Employment.** Neither liberty nor property interests are at stake when an at-will employee loses a job but remains as free as before to seek another.
8. **Due Process: Libel and Slander.** Standing alone, stigma to one's reputation through defamatory statements is not sufficient to invoke the procedural protection of the Due Process Clause.

9. **Due Process: Public Officers and Employees: Termination of Employment: Libel and Slander.** If, in the course of subjecting an at-will employee to the present injury of termination, the State attaches to the employee a "badge of infamy" that impairs future employment opportunities, liberty interests come into play.

10. **Due Process: Public Officers and Employees: Termination of Employment: Libel and Slander: Words and Phrases.** The combination of stigmatizing state action coupled with some more tangible interest, thereby giving rise to a protectable interest under the 14th Amendment, is referred to as "stigma plus."

11. **Due Process: Public Officers and Employees: Termination of Employment: Libel and Slander.** Once a termination of employment qualifies as "stigma plus," due process is violated if the employee challenges the substantial truth of the defamatory statement and has not been given an opportunity for a name-clearing hearing.

12. **Libel and Slander: Words and Phrases.** A stigma is a mark or token of infamy, disgrace, or reproach.

13. **Due Process: Public Officers and Employees: Termination of Employment: Libel and Slander.** The requisite stigma for a stigma-plus claim has generally been found when an employer has accused an employee of serious character defects such as dishonesty, immorality, criminality, racism, and the like; it must be more than allegations of incompetence or the fact of the employment decision itself.

14. **Civil Rights: Due Process: Public Officers and Employees: Termination of Employment: Libel and Slander.** A supervisor is not responsible under a 42 U.S.C. § 1983 (2006) stigma-plus claim for unauthorized rumors circulating among employees.

15. **Civil Rights: Employer and Employee: Liability.** There is no respondeat superior liability under 42 U.S.C. § 1983 (2006).

16. **Due Process: Public Officers and Employees: Termination of Employment: Libel and Slander.** The requirement of public dissemination in stigma-plus claims limits constitutional claims to those instances where the stigmatizing charge is likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities.

17. ____: ____: ____: ____. What is sufficient to constitute "public disclosure" in a stigma-plus claim will vary with the circumstances of each case.

18. ____: ____: ____: ____. Statements protected by qualified privilege do not pass the stigma-plus test.

19. **Public Officers and Employees: Libel and Slander: Words and Phrases.** Conditional or qualified privilege comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which the author has a duty—public, personal, private, legal, judicial, political, moral, or social—made to a person having a corresponding interest or duty.

Appeal from the District Court for Lancaster County: STEPHANIE F. STACY, Judge. Affirmed.

Abby Osborn, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

John C. Wiltse, of University of Nebraska, and David R. Buntain, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellees.

HEAVICAN, C.J., CONNOLLY, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ.

MCCORMACK, J.

## NATURE OF CASE

A former temporary employee brought action under 42 U.S.C. § 1983 (2006) against the Board of Regents of the University of Nebraska (Board of Regents) and two of its managers after an e-mail circulated the day of the employee's termination of employment, warning coworkers to alert campus police and lock their doors if they saw him. The employee makes a "stigma plus" claim that he was deprived of a liberty interest in his good name without due process of law in violation of the 14th Amendment to the U.S. Constitution. The Board of Regents asserts that it is shielded by sovereign immunity and is not a "person" under § 1983 or Neb. Rev. Stat. § 20-148 (Reissue 2012) and that the managers are protected by qualified sovereign immunity because the alleged violation was not clearly established. The district court granted summary judgment in favor of the defendants, and the employee appeals the judgment. We affirm.

## BACKGROUND

Paul D. Potter was a student at the University of Nebraska-Lincoln (University) studying electrical engineering. From 2006 to 2009, Potter was a part-time student employee working for the Communications and Information Technology Department (CIT) as a help desk technician at the call center located in Miller Hall on the University's east campus. Potter often provided technical support at nearby Agricultural Hall, where the office of the vice chancellor was located. The assistant vice chancellor was the unit director for CIT.

Potter began working full time in 2009, while still a student. The full-time employment offer stated that the "temporary appointment" was to begin October 28, 2009, and "may last until" August 14, 2010, but could "be ended for any reason and without notice."

A background check conducted in relation to the full-time position revealed that in 2004, Potter had been charged with burglary, battery, and stalking, and had pled guilty to the misdemeanor offenses of trespass on an unenclosed curtilage, harassing a witness to hinder a report, and battery. He had been fined and sentenced to 12 months of probation. The chancellor's office discussed these matters with Potter, and there is a notation on a copy of his criminal record to "disregard" the 2004 charges. The University also became aware at this time that Potter was on probation for a recent conviction of driving under the influence.

Around the same time that Potter was given the new temporary appointment, Potter's manager at the call center was promoted to a position outside of CIT and a new manager, Terry Bockstadter, transferred in. Robert Losee was the information technology coordinator and Bockstadter's supervisor.

CIT was also moving at that time to a fee-for-service charging model. As a result, CIT technicians were expected to keep time-tracking records with appropriate codes for services provided. Potter and other technicians struggled with the transition. Notes and e-mails reflect that beginning February 15, 2010, and continuing up to July 12, Potter was repeatedly counseled that he needed to do better with his timesheets.

In June 2010, Potter was asked to sign a statement reflecting issues that needed to be rectified "in order for [him] to continue to be an effective part of the CIT Help Desk." These issues included the accurate and timely submission of time-tracking reports and Potter's failure to communicate daily availability status. Potter refused to sign the statement.

Sometime before July 20, 2010, Losee contacted human resources about the possibility of terminating Potter's employment. Pursuant to standard University procedure, human resources completed a "threat assessment" in relation to the possible termination. The threat assessment for Potter noted

manager concerns based on Potter's "previous reaction of getting upset over discussion on work performance," a decrease in sociability in the last year, and his criminal record. The threat assessment was forwarded to campus police to determine whether there was any cause for concern. The record does not directly reflect what campus police communications took place regarding the threat assessment.

On the morning of July 20, 2010, two police officers arrived at Potter's place of work and escorted him away. Apparently unbeknownst to Potter or anyone else, a bench warrant for Potter's arrest had been issued after he missed a court date in relation to his probation for the conviction of driving under the influence. Potter testified in his deposition that he had not received the mailing advising him of the court date.

Potter did not explain to his superiors or coworkers the circumstances surrounding the police visit and his sudden departure, which was witnessed by Bockstadter. Potter explained that he did not say anything, because he thought Bockstadter had been the one to alert the police of the outstanding warrant. Losee alerted human resources that two plainclothes Lincoln Police Department officers had been looking for Potter at his place of work.

The decision to terminate Potter's employment was finalized that afternoon. A personnel coordinator consulted human resources about drafting a release to employees in what had recently become known as the EdMedia department (formerly CIT), pursuant to University procedure to ensure the safety of University technology when an employee with access to sensitive technological equipment is terminated. The proposed release did not mention termination of any employee, but advised that the EdMedia department would be changing passwords and access privileges. The proposed release was sent via e-mail to a few select University employees.

Human resources asked that the recipients of the e-mail be discreet and explained:

> We will move forward with termination of [Potter] tomorrow if possible. We are not sure when that will

happen. It will depend if [Potter] shows up to work. HR, [University] Police and EAD will be involved in the termination meeting.

At this point the police have been unable to locate [Potter].

Potter did not show back up to work and did not advise Bockstadter or Losee as to the reason for his unexpected and police-escorted departure. On the afternoon of July 21, 2010, an administrative employee sent an e-mail to 27 University employees working in either Miller Hall or Agricultural Hall. The e-mail stated:

Judy went around this afternoon to let available staff members know of the situation regarding the termination of . . . Potter, Help Desk student worker. If you see him in the building, please shut and lock your door and call me . . . and I will alert the Campus Police. We do not need to be fearful but cautious and aware of who is in our building.

Potter was in court the morning of July 21, 2010, responding to the bench warrant. He explained in his deposition that he could not be reached while in court. When he arrived at east campus later that afternoon, Potter received an e-mail from a coworker telling him that his coworkers were told to call the police if they saw him. According to Potter, another coworker who also received the e-mail told him that an administrative employee was crying and telling people to check their e-mail and lock their doors. According to Potter, that coworker told Potter that the administrative employee had "implied" that Potter had a gun.

When Potter saw campus police, he left without incident. Potter subsequently received a letter dated July 22, 2010, informing him of his termination effective that same date.

In addition to those employees who received the e-mail, Potter identified three other persons who were warned of his possible presence on campus that day.

First, according to Potter, an employee working in Agricultural Hall told him someone had come in and told her "there was an alert that there was somebody on campus."

Second, Potter's CIT manager from 2006 to 2009 was defending her dissertation in Agricultural Hall when her advisor warned her that they may have to go into "lockdown." She learned from the vice chancellor's office that the warning related to Potter. She testified that she also heard a "rumor" that Potter had a gun.

Third, according to the aforementioned former CIT manager, Losee had told the assistant vice chancellor's wife about the alert. Losee had apparently attempted to contact the assistant vice chancellor/CIT unit director at his home, but he was out of town. Losee told the assistant vice chancellor's wife, who had answered the telephone, that if Potter showed up, she should not let him in.

According to Potter, that same assistant vice chancellor later apologized to him for the way his termination was handled. The assistant vice chancellor explained there had been a "mistake."

Potter stated that since the incident, he has not returned to east campus. But he has not had any trouble enrolling in classes, which he takes at the main campus. He was able to obtain employment as a network manager with a retirement home, but was laid off for lack of funds for the position. He is currently self-employed. Potter presented no evidence that prospective employers were aware or were likely to become aware of the events that transpired on July 21, 2010. Potter presented no evidence that the community at large was aware or likely to become aware of the incident.

Potter sued the Board of Regents and Bockstadter and Losee in their individual capacities. Potter alleged a cause of action under § 1983 and § 20-148, for being deprived of a liberty interest in his good name without due process of law, in violation of the 14th Amendment to the U.S. Constitution. Potter also alleged an action for discrimination under Neb. Rev. Stat. § 48-1104 (Reissue 2010), but that claim is no longer asserted on appeal. The principal relief sought was compensatory damages for loss of reputation, emotional distress, and humiliation, but he also stated claims for declaratory and injunctive relief.

Potter did not seek reinstatement of his employment with the University.

The district court granted summary judgment in favor of the defendants. The court found the evidence insufficient to create a genuine issue of material fact that the statements in the e-mail stigmatized Potter by seriously damaging his reputation or that the statement foreclosed other employment opportunities; thus, Potter's due process rights were not violated. The court found that even if they were violated, sovereign immunity protected the defendants from the claim. As to Bockstadter and Losee, the court found that the constitutional right allegedly violated had not been clearly established and that thus, the claim was barred by qualified immunity. Potter appeals.

## ASSIGNMENTS OF ERROR

Potter assigns that the district court erred in finding (1) that there was no genuine issue of material fact that he had not sufficiently suffered a constitutional violation and (2) that Potter's alleged right was not clearly established at the time.

## STANDARD OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[1]

## ANALYSIS

Potter admits he is no longer pursuing equitable relief. Instead, he seeks monetary relief for the alleged deprivation of his right to procedural due process. The Board of Regents and Bockstadter and Losee in their official capacities are entitled to sovereign immunity and do not qualify as "persons" under

---

[1] *Peterson v. Homesite Indemnity Co.*, ante p. 48, 840 N.W.2d 885 (2013).

§ 1983.[2] Section 20-148 is a procedural statute designed to allow plaintiffs to bypass administrative procedures in discrimination actions against private employers; it does not operate to waive sovereign immunity and has no application here.[3]

[2,3] We are presented with Potter's claims under § 1983 against Bockstadter and Losee for actions taken in their individual capacities under color of state law.[4] Qualified immunity protects government officials acting in their individual capacities from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[5] A qualified immunity analysis has two prongs: (1) whether the official violated a statutory or constitutional right and (2) whether the right was clearly established at the time of the challenged conduct.[6] Courts have discretion to decide which of the two prongs to address first.[7] Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.[8] We agree with the district court

---

[2] See, *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); *Michael E. v. State*, 286 Neb. 532, 839 N.W.2d 542 (2013); *Doe v. Board of Regents*, 280 Neb. 492, 788 N.W.2d 264 (2010); *Shearer v. Leuenberger*, 256 Neb. 566, 591 N.W.2d 762 (1999), *disapproved on other grounds, Simon v. City of Omaha*, 267 Neb. 718, 677 N.W.2d 129 (2004).

[3] See, *Stanton v. Sims*, ___ U.S. ___, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013); *Ritchie v. Walker Mfg. Co.*, 963 F.2d 1119 (8th Cir. 1992); *Goolsby v. Anderson*, 250 Neb. 306, 549 N.W.2d 153 (1996); *Wiseman v. Keller*, 218 Neb. 717, 358 N.W.2d 768 (1984); *Sinn v. City of Seward*, 3 Neb. App. 59, 523 N.W.2d 39 (1994).

[4] See, e.g., *Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).

[5] See, *Brandon v. Holt*, 469 U.S. 464, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985); *Michael E. v. State, supra* note 2.

[6] See, e.g., *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).

[7] *Id.*

[8] *Messerschmidt v. Millender*, ___ U.S. ___, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012).

that qualified immunity bars Potter's § 1983 action against Bockstadter and Losee.

[4-6] "Section 1983, which derives from § 1 of the Civil Rights Act of 1871, 17 Stat. 13, creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States."[9] The 14th Amendment's Due Process Clause does not, however, extend to citizens a right to be free of injury wherever the State may be characterized as the tort-feasor.[10] Rather, procedural due process limits the ability of the government to deprive people of interests that constitute "liberty" or "property" interests within the meaning of the Due Process Clause and requires that parties deprived of such interests be provided adequate notice and an opportunity to be heard.[11] Procedural due process claims center on the "requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'"[12]

[7,8] Neither liberty nor property interests are at stake when an at-will employee loses a job but remains as free as before to seek another.[13] Likewise, standing alone, stigma to one's reputation through defamatory statements is not sufficient to invoke the procedural protection of the Due Process Clause.[14]

[9] But one of the liberties protected by the 14th Amendment is the individual's right "'to engage in any of the common occupations of life.'"[15] And federal circuit

---

[9] *Rehberg v. Paulk*, ___ U.S. ___, 132 S. Ct. 1497, 1501, 182 L. Ed. 2d 593 (2012).

[10] See *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976).

[11] See *State v. Worm*, 268 Neb. 74, 680 N.W.2d 151 (2004).

[12] *Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[13] See, e.g., *Bishop v. Wood*, 426 U.S. 341, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); *Speer v. City of Wynne, Ark*., 276 F.3d 980 (8th Cir. 2002); *Johnston v. Panhandle Co-op Assn*., 225 Neb. 732, 408 N.W.2d 261 (1987).

[14] See *Paul v. Davis, supra* note 10.

[15] *Board of Regents v. Roth, supra* note 13, 408 U.S. at 572.

courts have universally held that if, in the course of subjecting an at-will employee to the present injury of termination, the State attaches to the employee a "'badge of infamy'" that impairs future employment opportunities, liberty interests come into play.[16]

[10] The combination of stigmatizing state action coupled with some more tangible interest, thereby giving rise to a protectable interest under the 14th Amendment, is referred to as "stigma plus."[17] It is the individual's status as a government employee and not his property interest in continued employment which furnishes the "plus" in at-will termination cases.[18]

[11] Once the termination qualifies as stigma plus, due process is violated if the employee challenges the substantial truth of the defamatory statement and has not been given an opportunity for a name-clearing hearing.[19] If no name-clearing hearing is provided, or if the hearing is inadequate, the former employee may sue for monetary damages.[20]

It appears that in the context of termination of at-will employment, more is required to allege the necessary level of defamation and dissemination in a stigma-plus due process claim than the kind of damage to reputation sufficient for a simple tort defamation claim.[21] Thus, the Second Circuit

---

[16] See *Paul v. Davis, supra* note 10, 424 U.S. at 705. See, also, e.g., *Codd v. Velger*, 429 U.S. 624, 97 S. Ct. 882, 51 L. Ed. 2d 92 (1977); *Board of Regents v. Roth, supra* note 13; *Brown v. Simmons*, 478 F.3d 922 (8th Cir. 2007); *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292 (4th Cir. 2006); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262 (10th Cir. 1989); *Doe v. United States Dept. of Justice*, 753 F.2d 1092 (D.C. 1985).

[17] See, e.g., *Zutz v. Nelson*, 601 F.3d 842 (8th Cir. 2010); *State v. Norman*, 282 Neb. 990, 808 N.W.2d 48 (2012).

[18] *Dennis v. S & S Consolidated Rural H.S. Dist.*, 577 F.2d 338 (5th Cir. 1978).

[19] See *Paul v. Davis, supra* note 10. See, also, e.g., *Codd v. Velger, supra* note 16; *Board of Regents v. Roth, supra* note 13; *Brown v. Simmons, supra* note 16.

[20] *Patterson v. City of Utica*, 370 F.3d 322 (2d Cir. 2004).

[21] *Filgueiras v. Newark Pub. Schools*, 426 N.J. Super. 449, 45 A.3d 986 (2012).

requires that the defendant employer made stigmatizing state-
ments about the plaintiff that call into question the plaintiff's
good name, reputation, honor, or integrity or that denigrate
the plaintiff's competence as a professional and impugn the
plaintiff's professional reputation in such a fashion as to
effectively put a significant roadblock in the plaintiff's con-
tinued ability to practice his or her profession.[22] The Ninth
Circuit requires that the charge against the plaintiff is one that
might seriously damage his or her standing and associations
in the community.[23] The Sixth Circuit requires that the false,
stigmatizing statements not be merely allegations of improper
or inadequate performance, incompetence, neglect of duty,
or malfeasance.[24] The Seventh Circuit requires a tangible
loss of other employment as a result of a stigmatizing pub-
lic disclosure.[25]

Most courts set forth several conjunctive elements for an
at-will termination stigma-plus claim. The elements are var-
iously stated and somewhat intertwined. We will utilize the
test of the Eighth Circuit, which requires that (1) the public
employer's reasons for the discharge stigmatized the employee
by seriously damaging his standing and association in the
community or by foreclosing employment opportunities that
may otherwise have been available, (2) the public employer
made the reason or reasons public, and (3) the employee
denied the charges.[26]

[12,13] We have explained that a stigma is a mark or
token of infamy, disgrace, or reproach.[27] The requisite stigma
for a stigma-plus claim has generally been found when
an employer has accused an employee of serious character
defects such as dishonesty, immorality, criminality, racism,

---

[22] *Segal v. City of New York*, 459 F.3d 207 (2d Cir. 2006); *Patterson v. City of Utica, supra* note 20.

[23] See *Llamas v. Butte Community College Dist.*, 238 F.3d 1123 (9th Cir. 2001).

[24] See *Brown v. City of Niota, Tenn.*, 214 F.3d 718 (6th Cir. 2000).

[25] See *Abcarian v. McDonald*, 617 F.3d 931 (7th Cir. 2010).

[26] See *Speer v. City of Wynne, Ark., supra* note 13.

[27] *State v. Norman, supra* note 17.

and the like;[28] it must be more than allegations of incompetence or the fact of the employment decision itself.[29]

This case involves the alleged stigma arising from an implied character charge of dangerousness communicated in security warnings during an employee's termination. Specifically, the warnings at issue stated that Potter was being terminated that day and that persons who saw him should be "cautious" and lock their doors and notify campus police.

[14,15] We find insufficient evidence that either Bockstadter or Losee was responsible for any alleged statements or implications to the effect that Potter was roaming around east campus with a gun. A supervisor is not responsible under a § 1983 stigma-plus claim for unauthorized rumors circulating among employees.[30] The U.S. Supreme Court has made clear that there is no respondeat superior liability under § 1983.[31] The standard by which a supervisor is held liable under § 1983 in his or her individual capacity for the actions of a subordinate is extremely rigorous.[32] The plaintiff must establish that the supervisor personally participated in the unconstitutional conduct or was otherwise the moving force of the violation

---

[28] See, e.g., *Board of Regents v. Roth, supra* note 13; *Ridpath v. Board of Governors Marshall University, supra* note 16; *Winegar v. Des Moines Indep. Com. School Dist.*, 20 F.3d 895 (8th Cir. 1994).

[29] See, e.g., *Zepp v. Rehrmann*, 79 F.3d 381 (4th Cir. 1996); *Jones v. University of Iowa*, 836 N.W.2d 127 (Iowa 2013); *Herrera v. Union No. 39 School Dist.*, 186 Vt. 1, 975 A.2d 619 (2009).

[30] See *Palmer v. City of Monticello*, 31 F.3d 1499 (10th Cir. 1994). See, also, *Lancaster v. Independent School Dist. No. 5*, 149 F.3d 1228 (10th Cir. 1998); *Silva v. Worden*, 130 F.3d 26 (1st Cir. 1997); *Fittshur v. Village of Menomonee Falls*, 31 F.3d 1401 (7th Cir. 1994); *Moore v. State of Ind.*, 999 F.2d 1125 (7th Cir. 1993); *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988).

[31] See, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997); *Monell v.New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

[32] *Mann v. Taser Intern., Inc.*, 588 F.3d 1291 (11th Cir. 2009).

by authorizing, approving, or knowingly acquiescing in the unconstitutional conduct.[33]

Potter only presented limited evidence of Bockstadter's and Losee's involvement in the e-mail and the corresponding verbal warnings. Potter did not present Bockstadter's or Losee's testimony, or the testimony of the author of the e-mail warning or the employee who verbally disseminated that warning. There are no admissions in the record pertaining to Bockstadter's or Losee's participation in the warnings. Nevertheless, based on the chain of events reflected in internal e-mails and Bockstadter's and Losee's positions within the EdMedia department, we will generously infer a material issue as to whether they were responsible for the alleged character charge. We will also accept for purposes of this appeal the hearsay testimony that Losee called the assistant vice chancellor's wife and told her not to open the door for Potter, because there was no objection to that testimony.

The alleged stigma in this case is unique. Because of highly publicized incidents of workplace and school violence and the mounting pressure on employers and educational institutions to proactively protect their employees and students from such violence,[34] the warnings may have merely communicated zealous security measures rather than a stigmatizing character charge. Even assuming there was a stigmatizing character charge, however, Potter failed to present a material issue that this charge seriously damaged his standing and association in the community or foreclosed employment opportunities that might otherwise have been available.

---

[33] See, *Franklin v. Curry*, 738 F.3d 1246 (11th Cir. 2013); *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760 (10th Cir. 2013); *Myers v. Bowman*, 713 F.3d 1319 (11th Cir. 2013); *Burlison v. Springfield Public Schools*, 708 F.3d 1034 (8th Cir. 2013); *Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012); *Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012); *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).

[34] See Kimberly Smith, *A Plea for Mandatory Disclosure: Urging Michigan's Legislature to Protect Employees Against Increasing Phenomena of Workplace Violence*, 79 U. Det. Mercy L. Rev. 611 (2002).

[16] There can be no "infamy" unless the character charge is sufficiently made public.[35] The requirement of public dissemination in stigma-plus claims limits constitutional claims to those instances where the stigmatizing charge is likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities.[36]

Potter argues that dissemination of the warning to certain employees not in the building where he worked, and to the assistant vice chancellor's wife, means there was "public" dissemination and that, thus, that element of his claim has been met. He also points out that in *Putnam v. Keller*,[37] the court upheld the denial of summary judgment for defendants who had disseminated to the faculty and staff of several campuses, as well as to the local sheriff and county attorney, "'stayaway'" letters accusing a former employee of theft and other immoral conduct.

[17] But what is sufficient to constitute "public disclosure" in a stigma-plus claim will vary with the circumstances of each case.[38] In determining the degree of dissemination that satisfies the "public disclosure" requirement, courts must look to the potential effect of dissemination on the employee's standing in the community and the foreclosure of job opportunities.[39] Accordingly, in a different case, *Nuttle v. Ponton*,[40] a student who sought employment at the college where she studied did not state a stigma-plus claim, because the "'judiciary file'" against her was not disseminated outside the college.

---

[35] See *State v. Norman, supra* note 17.

[36] See, e.g., *Donato v. Plainview-Old Bethpage Cent. School Dist.*, 96 F.3d 623 (2d Cir. 1996); *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir. 1994); *Wilcox v. Newark Valley Cent. School Dist.*, 107 A.D.3d 1127, 967 N.Y.S.2d 432 (2013).

[37] *Putnam v. Keller*, 332 F.3d 541, 547 (8th Cir. 2003).

[38] See, e.g., *Brandt v. Board of Co-op. Educational Services*, 820 F.2d 41 (2d Cir. 1987).

[39] *Id*.

[40] *Nuttle v. Ponton*, 544 F. Supp. 2d 175, 176 (W.D.N.Y. 2008).

Other than the assistant vice chancellor's wife, Potter did not allege that the warning was or would be disseminated outside of east campus. There is no evidence that the e-mail is maintained as part of Potter's personnel file and will be shared with prospective employers. As explained already, the statements were unique to the circumstances existing at the time they were made, and the stigma associated with the warnings is tempered by the commonsense understanding that proactive security measures do not always target those who are genuinely dangerous. In fact, Potter admitted that none of the people whom he knew and who had received the warning changed their opinion of his character as a result. Under the circumstances, the extent of the dissemination did not threaten to seriously damage his standing and association in the community or to foreclose employment opportunities that may otherwise have been available.

[18] Moreover, there is no material issue of fact that the statements were protected by qualified privilege. Statements protected by qualified privilege do not pass the stigma-plus test.[41]

[19] Conditional or qualified privilege comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which the author has a duty—public, personal, private, legal, judicial, political, moral, or social—made to a person having a corresponding interest or duty.[42] Whether a qualified privilege exists is a matter of law.[43]

The warnings here were on a subject matter to which the authors had a moral duty, and the statements were made

---

[41] See, *Abelli v. Ansonia Bd. of Educ.*, No. 3:12-cv-1432, 2013 WL 6587784 (D. Conn. Dec. 13, 2013); *Wilcox v. Newark Valley Cent. School Dist.*, *supra* note 36; *Sweet v. Tigard-Tualatin School Dist. #23J*, 124 Fed. Appx. 482 (9th Cir. 2005).

[42] *Turner v. Welliver*, 226 Neb. 275, 411 N.W.2d 298 (1987); *Helmstadter v. North Am. Biological*, 5 Neb. App. 440, 559 N.W.2d 794 (1997).

[43] *Id.*

to persons with a corresponding interest in their well-being. Publication is privileged if made for the purpose of protecting anyone—friend, employee, or stranger—against violence.[44]

There was no evidence from which one could reasonably find actual malice in disseminating the warning pertaining to Potter's discharge. While Bockstadter and Losee may have been mistaken about the need for the measures taken, there is no indication that they acted with knowledge that Potter presented no danger the day he was terminated or with reckless disregard to the truth of such implied character charge. Not only were Bockstadter and Losee aware of Potter's past criminal convictions, which included assault, there was documentation of emotional reactions to negative feedback and social withdrawal. Most significantly, Bockstadter and Losee were left in the dark after Potter was escorted off campus by police pursuant to an outstanding warrant of an unknown nature, and they had no knowledge of Potter's whereabouts or state of mind at the time of discharge. Potter testified that he worked as a technician throughout east campus, but especially in Agricultural Hall. The call center is located in Miller Hall. Thus, there is no indication that the extent of dissemination throughout Miller Hall and Agricultural Hall was in bad faith. Likewise, there was no evidence that Losee acted in bad faith when warning the assistant vice chancellor's wife of Potter's possible arrival at their home. The assistant vice chancellor was Potter's unit director.

Potter has failed to demonstrate a material issue as to whether Bockstadter and Losee violated a clearly established due process right. Indeed, we can find no other case in which a stigma-plus claim has arisen from warnings meant to protect employees and other persons believed to be in danger. Bockstadter and Losee made good faith judgments about how to best protect their employees, students, and the assistant vice chancellor's wife. They were protected by qualified immunity, and the court properly granted summary judgment in their favor.

---

[44] See Restatement (Second) Law of Torts § 595, comment *g*. (1977).

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court granting summary judgment in favor of the defendants.

AFFIRMED.

WRIGHT and STEPHAN, JJ., not participating.

————————

STATE OF NEBRASKA, APPELLEE, v.
ANTOINE D. YOUNG, APPELLANT.
___ N.W.2d ___

Filed March 21, 2014.    No. S-13-557.

1. **DNA Testing: Appeal and Error.** A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.
2. ____: ____. In an appeal from a proceeding under the DNA Testing Act, the trial court's findings of fact will be upheld unless such findings are clearly erroneous.
3. **DNA Testing.** The DNA Testing Act, passed in 2001, was created to allow wrongfully convicted persons an opportunity to establish their innocence through DNA testing.
4. ____. A person in custody takes the first step toward obtaining possible relief under the DNA Testing Act by filing a motion requesting forensic DNA testing of biological material.
5. **DNA Testing: Evidence.** After a proper motion seeking forensic DNA testing has been filed, the State is required by Neb. Rev. Stat. § 29-4120(4) (Reissue 2008) to file an inventory of all evidence that was secured by the State or a political subdivision in connection with the case.
6. **DNA Testing: Collateral Attack.** An action under the DNA Testing Act is a collateral attack on a conviction and is civil in nature.
7. **DNA Testing: Proof.** The burden of proof under the DNA Testing Act is upon the defendant.
8. **DNA Testing: Affidavits: Evidence.** Under the DNA Testing Act, the defendant has the burden to provide the district court with affidavits or evidence at a hearing establishing the three required factual determinations for the district court under Neb. Rev. Stat. § 29-4120(5) (Reissue 2008).
9. **DNA Testing: Evidence.** Under the DNA Testing Act, DNA evidence which was available at trial but not pursued is not considered to have been unavailable.

Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed.